**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 14-652-13** |
| | : | |
| **MIGUEL IRIZZARY** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                          **February 25, 2021**

Miguel Irizarry moves for compassionate release from the last eighteen months of his heroin conspiracy sentence at FCI Danbury.  He contracted and recovered from COVID-19 last Spring. He requested compassionate release and the Warden denied his request in June 2020.  He did not then move for release.  The facility recently provided him the first of two COVID-19 vaccinations a few weeks ago.   With the benefit of vaccination, Mr. Irizarry now moves for release arguing his fear of a return of COVID-19 and a newly arisen need to become the caretaker for his brother suffering with cerebral palsy. He argues his brother's home health therapists cannot visit under COVID-19 protocols, their mother's physician recently came to believe she should no longer take care of him, and Mr. Irizarry's wife and two children (ages twenty-one and seventeen) are too "stretched" right now with their virtual schooling and other obligations to help in caring for his brother. We appreciate it would be more convenient for Mr. Irizarry's family to cut short his already reduced sentence for admittedly importing and distributing heroin to care for his brother given their other obligations, but we are not a quasi-parole board granting early leave under federal sentencing policy.  He fails to show the extraordinary and compelling reasons required for release. He also presents a danger to others and the community and early release is inconsistent with the sentencing factors set by Congress.  We deny his motion for compassionate release.

I.     **Facts**

Our grand jury returned a fourth superseding indictment charging state parolee Miguel Irizarry and thirty-six other individuals for their involvement in a Mexico-based, drug trafficking organization responsible for distributing 1,000 kilograms of heroin to various cities across the United States over a period of five years.[1] The grand jury specifically charged Mr. Irizarry with (1) conspiracy to distribute one kilogram or more of heroin and (2) conspiracy to import one kilogram or more of heroin.[2] The United States adduced evidence Mr. Irizarry worked as a "street-level manager" in Camden, New Jersey who managed street-level drug dealers.[3] Mr. Irizarry pled guilty to the charges and stipulated he, along with his co-conspirators operating out of Camden, distributed approximately 100 kilograms of heroin.[4]

At the time of his sentencing, Mr. Irizarry had a state conviction for aggravated manslaughter for which he received a thirteen-year prison sentence.[5] He further had three juvenile adjudications for harassment, conspiracy and distribution of a controlled substance, and terroristic threats.[6] Mr. Irizarry faced life in prison.  We departed downward and set a guidelines range of 121-151 months.

We varied downward even further and sentenced Mr. Irizarry to 108 months' imprisonment and five years of supervised release.[7] Mr. Irizarry did not appeal his significantly reduced sentence.[8] He is currently serving his sentence at the Danbury, Connecticut Federal Correctional Institution ("FCI Danbury").  The Bureau of Prisons reports Mr. Irizarry will be released on September 10, 2022.[9]

The United States represents Mr. Irizarry has had three disciplinary infractions while incarcerated – fighting with another person in 2017, possessing a cell phone in 2019, and

threatening bodily harm to prison staff last year.[10] Mr. Irizarry represents he participates in a Residential Drug Abuse program.[11]

A.     Mr. Irizarry's present risk of contracting COVID-19 at FCI Danbury.

Thirty-eight-year-old Mr. Irizarry states he suffers from asthma.[12]  Mr. Irizarry provides medical records from 2014 showing a doctor prescribed him prednisone and an albuterol inhaler to treat his asthma.[13]  His doctor did not place activity restrictions on Mr. Irizarry due to his asthma.[14]  Mr. Irizarry's recent medical records do not show any evidence of treatment or complications from asthma.[15] His body mass index was 33.1 – placing him in the obese category – as of November 6, 2020.[16]

Mr. Irizarry explains he is at risk of contracting "coronavirus disease 2019," or COVID-19, at FCI Danbury. The Centers for Disease Control and Prevention tells us COVID-19 spreads "mainly through close contact from person to person, including between people who are physically near each other (within about 6 feet)."[17]  "People who are infected but do not show symptoms can also spread the virus to others."[18]  The CDC recommends adopting three preventative measures to slow the virus's spread: (1) "[w]ear a mask to protect yourself and others"; (2) "[s]tay at least 6 feet . . . from others who don't live with you"; and (3) "[a]void crowds."[19]

COVID-19 poses a serious global public health risk. As of February 25, 2021, the Centers for Disease Control and Prevention reported a total of 28,065,327 cases of COVID-19 in the United States with 501,181 total deaths caused by the virus.[20] People of any age with the following conditions *are* at increased risk of severe illness from COVID-19: cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); down syndrome; immunocompromised state (weakened immune system) from solid organ transplant; obesity (body mass index [BMI] of 30 kg/m2 or higher); heart conditions, such as heart failure, coronary artery disease, or

cardiomyopathies; sickle cell disease; pregnancy; a history of smoking; and Type 2 diabetes mellitus.[21] People of any age with the following conditions *might* be at an increased risk for severe illness from COVID-19: asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pulmonary fibrosis (having damaged or scarred lung tissues); neurologic conditions (like dementia); liver disease; a body mass index greater than 25 kg/m2; pulmonary fibrosis; Thalassemia (a type of blood disorder); and Type 1 diabetes mellitus.[22]

Mindful correctional facilities face unique challenges in controlling the transmission of COVID-19, the CDC has issued guidance to prisons and correctional facilities to help them prevent the spread of COVID-19.[23] Following this guidance, the Bureau of Prisons adopted aggressive safety measures, assuring "maintaining safety and security of [its] institutions is [its] highest priority."[24] As of February 25, 2021, FCI Danbury reports it has two confirmed active COVID-19 cases – one inmate and one staff member – in an inmate population of 815.[25] Since the outbreak began, the Bureau of Prisons has confirmed 189 COVID-19 cases at FCI Danbury having administered tests to 806 inmates.[26]

Mr. Irizarry's medical records show he contracted COVID-19 in May 2020.[27] He remained asymptomatic and recovered two weeks later.[28] Mr. Irizarry's medical records further show he received the first of two doses of the Moderna COVID-19 vaccination in January 2021.[29] Recent studies demonstrate the first dose of Moderna has a 92% efficacy rate around two weeks after vaccination.[30]

### B.      Care for Mr. Irizarry's brother Jose's cerebral palsy.

Mr. Irizarry's forty-year-old brother Jose suffers from cerebral palsy, "a group of disorders that affect a person's ability to move and maintain balance and posture."[31]  Jose's doctor states his condition "affects his muscle tone, his movement, . . . his motor skills," and all of his body functions, "especially his motor skills, his muscles, his breathing, his bladder and bowl [sic] control, his eating and . . . his speech." [32]  Jose "has no function in his legs[] and limited function in his arms."[33]  According to his doctor, Mr. Irizarry "requires around the clock care" and "assistance performing all life sustaining tasks such as feedings, bathing, and mobility."[34]

Jose's family represents he previously received home therapy and care, but no longer can because of the COVID-19 pandemic.[35] Jose's mother, Evelyn, has also helped cared for Jose.[36] Evelyn, however, suffers from medical conditions including congestive heart failure, high blood pressure, and arthritis.[37]  In her physician's opinion, she should not take care of Jose.[38]  Mr. Irizarry's wife, Laly Fonseca, and her two children – ages twenty-one and seventeen – have also helped care for Jose.[39]  Ms. Fonseca states currently has two jobs and her kids are working full time, taking classes, and attending school virtually.[40]  She explains "either one of [her] children" stays with Jose while she works to "get him bathed, fed, dressed and situated for bed."[41]  Ms. Fonseca states she is "stretched beyond [her] limits to participate at all in Jose's care at this point."[42]

## II.     Analysis

Mr. Irizarry moves for compassionate release under the First Step Act of 2018, primarily arguing he needs to care for his forty-year-old brother Jose who suffers from cerebral palsy.[43] He further argues his asthma increases his risk of severe illness if he again contracts COVID-19 even after the vaccine. [44]  The United States opposes Mr. Irizarry's release, arguing his family

circumstances and well-managed medical conditions do not present an extraordinary and compelling reason for his early release.[45] Even if they did, the United States argues he should not be released because he continues to present a danger to his community.[46]   We agree with the United States.

Congress allows us to reduce a sentence through compassionate release if we determine: (1) the incarcerated movant meets administrative exhaustion requirements; (2) "extraordinary and compelling reasons"[47] warrant a reduction; (3) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (4) the applicable sentencing factors under 18 U.S.C. § 3553(a) warrant a reduction.[48] The applicable policy statements issued by the Sentencing Commission urge us to consider whether Mr. Irizarry would be a danger to the community if released.[49] A petitioner seeking compassionate release has the burden to prove extraordinary and compelling reasons exist.[50]

Having found Mr. Irizarry exhausted his administrative remedies, we now must decide whether Mr. Irizarry presents extraordinary and compelling reasons for his release, whether he presents a danger to others or his community, and whether the sentencing factors warrant a reduction. After careful consideration of the record, we deny Mr. Irizarry's motion because neither his family circumstances nor his relatively minor medical issues demonstrate an extraordinary and compelling reason for his early release. Even if they did, Mr. Irizarry would pose a danger to the community if released.

### A.   Mr. Irizarry's well-managed health conditions are not extraordinary and compelling reasons warranting his release.

Thirty-eight-year-old Mr. Irizarry is obese. He had a body mass index of 33.1 as of November of last year. In 2014, doctors prescribed Mr. Irizarry medication and an inhaler to use as needed for asthma. His medical records from the past two years do not, however, mention

asthma or any respiratory issues. He further contracted COVID-19 last summer, remained asymptomatic, and the Bureau of Prisons deemed him recovered two weeks later. He received the first dose of the Moderna COVID-19 vaccine in January of this year.

"[A] prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held."[51]  Our Court of Appeals tells us "the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."[52] "'[G]eneralized COVID-19 fears and speculation' are insufficient to warrant release."[53]

"[C]ourts have been reluctant in general to grant compassionate release where . . . *mild* obesity is the only risk factor presented."[54]  For example, in *United States v. Whiteman*, Judge Pappert concluded a forty-two-year-old obese petitioner with high blood pressure "f[ell] short of presenting an extraordinary and compelling reason for his release." [55]  Judge Pappert acknowledged the Centers for Disease Control and Prevention "reports that there is consistent evidence that obesity put[s] individuals at increased risk for severe illness from COVID-19."[56]  He found, however, the petitioner's obesity and hypertension to be "on the mild side," and "[g]iven [petitioner's] relative youth . . . and his lack of other risk factors," the petitioner's health did not warrant his release.[57] In *United States v. Williams*, Judge Pratter similarly denied compassionate release to a petitioner with a body mass index of 31.5 who suffered from moderate asthma, finding those conditions did not present extraordinary and compelling reasons for release.[58]  Judge Pratter found it significant the petitioner's body mass index "[was] very much so on the low end of the obesity spectrum . . . ."[59]

Courts outside our District have also found obesity—even when coupled with other health risks—does not present an extraordinary and compelling reason justifying compassionate release. For example, in *United States v. Grasha*, Judge Conti concluded a petitioner's body mass index of 48, falling in the "morbidly obese" range, "presents a serious risk" but "d[id] not arise to an extraordinary and compelling reason for release."[60] Judge Conti found the twenty-six-year-old petitioner had a "reduced risk for a serious COVID-19 reaction" because "[w]hen someone is morbidly obese, a younger age would mitigate some of the risk of the obesity."[61] Judge Flowers Conti further explained the petitioner's obesity did not create any heart rate, blood pressure, or blood oxygen level issues.[62]

We conclude Mr. Irizarry's body mass index of 33.1, falling near the "low end of the obesity spectrum," likewise does not present an extraordinary and compelling reason for his release. Like the petitioners in *Whiteman*, *Grasha*, and *Williams*, Mr. Irizarry's fails to adduce evidence he faces any health complications due to his obesity. Mr. Irizarry's relatively young age further mitigates any increased risk of severe illness he faces due to his obesity, as in *Whiteman* and *Grasha*.

Courts have also denied compassionate release where petitioner suffers from asthma that can adequately be controlled in prison. In *United States v. Moldover*, for example, Judge Slomsky denied compassionate release where petitioner suffered from moderate to severe asthma, hypertension, and obesity.[63] Doctors prescribed the petitioner an inhaler and other medications to treat the asthma.[64] Judge Slomsky found the petitioner's asthma did not warrant his release because "his present treatment and the . . . physician's exercise recommendation show that [the petitioner's] asthma [was] under control."[65] In *United States v. Daniels*, Judge Schiller likewise concluded a petitioner's asthma, which "appear[ed] under control," did not present an

extraordinary and compelling reason for his release.[66]  Judge Schiller explained while moderate or severe asthma may justify early release, the petitioner's medical records "offer[ed] no evidence of distress or diagnosis of severe asthma."[67]  The petitioner had suffered from asthma "for years" and the prison had his condition "well controlled."[68]

 We likewise conclude Mr. Irizarry's asthma is not an extraordinary and compelling reason warranting release.  From our review of his medical records, Mr. Irizarry's asthmatic condition is much less severe than the petitioners in *Moldover and Daniels*.  Mr. Irizarry only presents evidence from a 2014 medical evaluation during which a doctor prescribed medication and an inhaler to use as needed.[69]  His physician did not place any activity restrictions on Mr. Irizarry.[70]  And, far from having a long, documented history of asthma, Mr. Irizarry's recent medical records from the Bureau of Prisons do not even mention asthma.[71]  We cannot find his asthma places him in a high-risk category based solely on a few medical records from several years ago.

Mr. Irizarry's speculative fear of re-contracting COVID-19 is also insufficient to warrant his early release. We cannot conclude Mr. Irizarry is now fully immune from COVID-19 because "there is no scientific consensus on the issue" and we know there exist variants of the virus.[72]  But we do know FCI Danbury provided Mr. Irizarry at least one dose of a COVID-19 vaccine which studies tell us is around 92% effective against the virus two weeks after vaccination. FCI Danbury further has only one active case among its inmate population currently. And as Judge Pratter observed in *United States v. Wiltshire*, "the risk of reinfection after a prior positive test for COVID-19 is not a basis for compassionate release."[73]

While we do not underestimate the dangers of the current pandemic nor opine as to the efficacy of the vaccine provided to him, Mr. Irizarry's mild obesity and history of asthma do not

present extraordinary and compelling reasons for his release, especially given his recent COVID-19 vaccination and no evidence of increased risk in FCI Danbury as of today.

### B.     The need for Mr. Irizarry to care for his sick brother is not an extraordinary and compelling reason for his release.

Mr. Irizarry argues he should be released early because he needs to care for his brother suffering from cerebral palsy. The United States argues caring for siblings is not an extraordinary and compelling reason for release, and even if it is, Mr. Irizarry fails to establish himself as the only available caregiver. We agree Mr. Irizarry fails to establish he is the only person capable of caring for his brother.

The United States correctly states caring for ill or incapacitated siblings is not explicitly listed by the Bureau of Prisons as an extraordinary and compelling reason to reduce a final sentence. But as both parties recognize, courts generally liken such situations to the explicitly listed "family circumstances," which provide a petitioner may present an extraordinary and compelling reason for release in two situations: (1) "death or incapacitation of the caregiver of the defendant's minor child or minor children"; or (2) "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."[74]

Judges have denied compassionate release where a petitioner fails to demonstrate they are "the only available caregiver" for their ill or incapacitated family member.  In *United States v. Cruz-Rivera*,  Judge Slomsky denied compassionate release to a petitioner who allegedly needed to care for his child because he failed to establish his wife – who had diabetes and breast cancer – could not care for their child.[75]  Judge Slomsky explained the petitioner failed to show his wife's medical conditions incapacitated her and further failed to explain why other family members could not care for the child.[76]  In *United States v. Quintana*, Judge Robinson similarly denied to release a petitioner based on the need to care for an incapacitated sister who was paralyzed from the neck

down because petitioner failed to establish himself as the only available caregiver.[77]   Judge Robinson stated the petitioner's wife—though bearing the "burden of being a single mother who works full time and cares for her incapacitated sister-in-law"—could still care for the incarcerated individual's sister.[78]

As the United States correctly notes, we recently denied compassionate release under circumstances similar to Mr. Irizarry's in *United States v. Moore* because we found the petitioner failed to establish he was the only available caregiver for his mother suffering from dementia.[79] The petitioner had a twenty-one-year-old sister, an adult cousin, and a relative who could care for his mother. While they may not have felt equipped to care for the mother due to other obligations, we found they did not demonstrate they were incapacitated or otherwise physically unable to care for her.[80]

As in *Cruz-Rivera*, *Quintana*, and *Moore*, Mr. Irizarry fails to demonstrate his other family members cannot take care of his brother. We acknowledge Jose cannot presently receive home care services due to the pandemic, and that Jose's mother-in-law, Evelyn, can no longer provide around-the-clock care due to her congestive heart failure and other conditions. But Mr. Irizarry fails to demonstrate why his wife and their two adult children cannot act as Jose's caregivers. While we do not underestimate the burden Jose's health condition places on Mr. Irizarry's family, who have other work and school obligations, we cannot conclude Mr. Irizarry is his brother's only available caregiver under these circumstances.

The availability of Mr. Irizarry's wife, one adult child, one seventeen-year-old child, and potentially other family members distinguishes this case from the cases he offers as authority. They profess to be too busy with virtual schooling and their lives to care for Jose. For example, Judge Young granted compassionate release in *United States v. Bucci* based on a petitioner's need to care

for his ailing mother because the petitioner established himself as the only available caregiver.[81] In granting the motion, Judge Young expressly distinguished the petitioner's unique situation from the more common situation in which petitioners "have siblings or other family members able to care for their parents."[82] Judge McHugh similarly granted compassionate release in *United States v. Seals* based on a petitioner's need to care for her daughter because her caregiver became incapacitated from stage four pancreatic cancer.[83] The petitioner further adduced evidence her other family members could not care for her daughter due to incarceration, pending criminal charges, or unstable living conditions.[84]

Unlike the petitioners in *Seals* and *Bucci*, Mr. Irizarry does not establish himself as the only available caregiver. His wife and her kids are not incapacitated or otherwise unable to care for Jose. There is no evidence his mother, while wrestling with hypertension and arthritis, is incapacitated from helping at all.  There is no evidence the home health therapists will never return.

### C.    Releasing Mr. Irizarry presents a danger to others and the community.

Even assuming Mr. Irizarry presented extraordinary and compelling reasons for his release, Congress requires we consider whether Mr. Irizarry presents "a danger to the safety of any other person or to the community" before we reduce a carefully considered sentence. We agree with the Bureau of Prisons' determination Mr. Irizarry fails to show he warrants a sentence reduction.

The Sentencing Commission's policy statement, while not binding, nonetheless offers guidance and provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[85] Section 3142(g) sets out factors we must consider when deciding whether to release a defendant pending trial.[86] These factors include: (1) "the nature and circumstances of the offense charged, including

whether the offense is a crime of violence" or "involves a . . . firearm"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."[87]

These factors weigh heavily against Mr. Irizarry's early release.  Mr. Irizarry pled guilty to his involvement in a major conspiracy to import and distribute extremely large quantities of heroin from Mexico throughout the United States. These are very serious crimes, especially considering the current opioid epidemic. In 2015 – the year the United States indicted Mr. Irizarry and his co-conspirators – "the percentage of drug overdose deaths involving heroin was triple the percentage in 2010."[88] Mr. Irizarry engaged in this drug trafficking while on parole for an aggravated manslaughter conviction for which he served a thirteen-year prison sentence. He further has multiple juvenile adjudications of a violent nature. We commend Mr. Irizarry for his participation in a drug abuse program while incarcerated, but note he also has disciplinary infractions for fighting and threatening bodily harm to staff. We conclude he presents a risk of danger to the community if released due to the seriousness of his conviction and his significant, violent criminal history.

Courts have found petitioners convicted of similar crimes and with similar histories presented a danger to the community. In *United States v. Lugo*, for example, our Court of Appeals recently affirmed the denial of compassionate release to a petitioner who pled guilty to distributing cocaine while on supervised release for another crime.[89] The court found it reasonable for the district court to conclude petitioner posed a risk of danger to the community because of the serious nature of the drug trafficking conviction, his significant criminal history including reckless endangerment and possession of firearms, and his disciplinary infractions for fighting and

possession of narcotics while in custody.[90] In *United States v. Parks*, Judge Slomsky similarly denied compassionate release because he found petitioner – convicted of leading a conspiracy to obtain oxycodone pills for illegal street distribution – presented a risk of danger to the community.[91]   The petitioner had a lengthy criminal history which included an earlier incarceration for shooting another individual, cocaine distribution, and possession of firearm by a felon.[92]  Judge Slomsky, in denying the motion, observed the petitioner "admitted to leading a conspiracy to obtain oxycodone using fraudulent prescriptions, which put thousands of addictive pills on the street for illegal distribution."[93]   This harmful conduct, when combined with petitioner's criminal history, made him a danger to the community.[94] Consistent with the reasoning in *Lugo* and *Parks*, Mr. Irizarry presents a danger to the community if released.

Consideration of the Section 3553(a) sentencing factors further weighs against Mr. Irizarry's release. We departed and then varied downward to impose a 108-month sentence after carefully considering Mr. Irizarry's managerial role in a major drug trafficking organization, the fact Mr. Irizarry committed the offenses while on parole after serving a lengthy sentence, and his significant and violent criminal history. Cutting short this already significantly reduced sentence would not reflect the seriousness of his crimes or further the aims of punishment and deterrence.

The relatively short amount of time Mr. Irizarry has left on his sentence does not change this conclusion. In *United States v. Santiago*, Judge Bartle denied compassionate release to a petitioner even though he had "barely a year left" before his release from his ninety-seven-month sentence.[95]   Judge Bartle acknowledged the petitioner, who pled guilty to several counts of conspiracy to distribute cocaine and methamphetamine, presented evidence of rehabilitation and no longer presented a danger to the community.[96] Judge Bartle nonetheless found these positive factors "d[id] not outweigh other . . . factors which support the need for him to serve the sentence

imposed."[97] In *United States v. Concepcion*, Judge Slomsky likewise denied compassionate release where the petitioner, convicted of drug trafficking crimes, served around ninety-three percent of his sentence.[98]   Judge Slomsky found it significant the petitioner had previous convictions for possession of firearms and cocaine, disorderly conduct, gunpoint robbery, reckless endangerment, carrying a firearm without a license, simple assault, and burglary.[99]  Judge Slomsky explained "the magnitude of [the incarcerated individual's] crimes warrant[ed] the sentence he received," and "release at this point would neither reflect the serious of his offenses, promote respect for the law, [or] provide just punishment . . . ."[100]

We agree with the reasoning of Judges Bartle and Slomsky under similar circumstances and releasing Mr. Irizarry early would also be inconsistent with the Section 3553(a) factors.

## III.   Conclusion

We deny Mr. Irizarry's motion for compassionate release without prejudice because he fails to present extraordinary and compelling reasons for his release, he is still a danger to the community, and early release is inconsistent with the sentencing factors.

---

[1] *See* ECF Doc. No. 23 ¶¶ 8, 17, 19, 41.

[2] *Id.* at 1, 22-23.  "Heroin is a highly addictive opioid drug, and its use has repercussions far beyond the user."   *Overview*, *Heroin Research Report*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/publications/research-reports/heroin/overview (last updated June 2018).

[3] June 15, 2016 Presentence Investigation Report [hereinafter "PSR"] ¶¶ 12, 48.

[4] *Id.* ¶ 8.

[5] *Id.* ¶ 59.

[6] *Id.* ¶¶ 56-58.

[7] *See id.* ¶¶ 90, 93.

[8] *See* ECF Doc. No. 1333 at 2.

[9] *Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/, (last accessed Feb. 24, 2021).

[10] ECF Doc. No. 1333 at 3. Infractions for "threatening bodily harm and possession of a hazardous tool" are also referenced in the Warden's denial of Mr. Irizarry's compassionate release request. *See* ECF Doc. No. 1323-7.

[11] ECF Doc. No. 1323-1 at 9.

[12] *Id.* at 2.

[13] ECF Doc. No. 1323-7 at 4.

[14] *Id.* at 5.

[15] *See generally* ECF Doc. No. 1332.

[16] *Id.* at 72; *Adult BMI Calculator*, *Healthy Weight, Nutrition and Physical Activity*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last updated Sept. 17, 2020).

[17] *How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html   (last updated Oct. 28, 2020).

[18] *Id.*

[19] *Things to Know About the COVID-19 Pandemic*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/your-health/need-to-know.html (last updated Jan. 5, 2021).

[20] *Coronavirus Disease 2019 (COVID-19)*, *United States COVID-19 Cases and Deaths by State*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last updated Feb. 24, 2021).

[21] *Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated Feb. 22, 2021).

[22] *Id.*

[23] *Coronavirus Disease 2019 (COVID-19)*, *Guidance for Correctional & Detention Facilities*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated Feb. 18, 2021).

[24] *Updates to BOP Covid-19 Action Plan*, Bureau of Prisons, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last updated Mar. 19, 2020).

[25] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/ coronavirus/ (last updated Feb. 24, 2021).

[26] *COVID-19 Inmate Test Information*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last updated Feb. 24, 2021).

[27] ECF Doc. No. 1332 at 109-10.

[28] *Id.* at 88-94.

[29] *Id.* at 144.

[30] *Safety and Efficacy of the BNT162b2 mRNA Covid-19 Vaccine*, The New England J. of Med. (Feb. 17, 2021), https://www.nejm.org/doi/full/10.1056/NEJMc2036242; *see also The Moderna COVID-19 (mRNA-1273) vaccine: what you need to know*, World Health Organization (Jan. 26, 2021), https://www.who.int/news-room/feature-stories/detail/the-moderna-covid-19-mrna-1273-vaccine-what-you-need-to-know.

[31] ECF Doc. No. 1323-6 at 2; *Cerebral Palsy (CP)*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/ncbddd/cp/index.html (last reviewed Dec. 31, 2020).

[32] ECF Doc. No. 1323-6 at 2.

[33] *Id.*

[34] *Id.*

[35] ECF Doc. No. 1323-5 at 1.

[36] *Id.*

[37] ECF Doc. No. 1323-6 at 4.

[38] *Id.*

[39] ECF Doc. No. 1323-5 at 1-2.

[40] *Id.*

---

[41] *Id.* at 1.

[42] *Id.* at 2.

[43] *See* ECF Doc. No. 1323-1 at 7-12. The United States does not dispute Mr. Irizarry exhausted his administrative remedies. He submitted a compassionate release request to the Warden of FCI Danbury on June 10, 2020. ECF Doc. No. 1323-7 at 7-10.  The Warden denied the request on June 19, 2020, finding Mr. Irizarry failed to present extraordinary or compelling reasons for his release. *Id.* at 14 The Warden further explained Mr. Irizarry's recent sanctions "for threatening bodily harm and possession of a hazardous tool," and his "high risk of recidivism" rendered him ineligible for home confinement. *Id.*

[44] *See* ECF Doc. No. 1323-7 at 2-7.

[45] ECF Doc. No. 1333 at 10-19.

[46] *Id.* at 19-23.

[47] Application Note 1 to Section 1B1.13 of the United States Sentencing Guidelines outlines circumstances constituting "extraordinary and compelling reasons" under which district courts may reduce a term of imprisonment:

> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. 1B1.13, Application Note 1(A)-(D).

[48] 18 U.S.C. § 3582.

[49] *See, e.g., United States v. Rodriguez*, 451 F. Supp. 3d 392, 406 (E.D. Pa. Apr. 1, 2020).

[50] *See, e.g., United States v. Epstein,* No. 14-287, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020) (noting a defendant possesses the burden to establish extraordinary and compelling exist to justify compassionate release).

[51] *United States v. Tartaglione*, No. 15-491, 2020 WL 3969778, at *5 (E.D. Pa. July 14, 2020) (quoting *United States v. Somerville,* No. 12-225, 2020 WL 2781585, at *20 (W.D. Pa. May 29, 2020)).

[52] *United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020).

[53] *United States v. Phillips*, No.09-718, 2020 WL 5076753, at *4 (E.D. Pa. Aug. 27, 2020) (quoting *United States v. Upshur*, No. 18-124-2, 2020 WL 3128026, at *2 (E.D. Pa. June 12, 2020)) (denying compassionate release where the petitioner failed to demonstrate "more than mere speculative risk of exposure").

[54] *United States v. Collazo*, No. 99-304, 2021 WL 632678, at *3 (E.D. Pa. Feb. 18, 2021) (emphasis added). *But see United States v. Ishmael*, No. 12-155, 2021 WL 567747, at *6 (E.D. Pa. Feb. 16, 2021) (considering obesity as an extraordinary and compelling reason for release "[b]ecause the Government concedes that Defendant's obesity presents a COVID-19 risk factor," but acknowledging "courts have rejected claims of extraordinary and compelling reasons for release based on obesity, hypertension, and pre-diabetes").

[55] *United States v. Whiteman*, No. 15-00298, 2020 WL 4284619, at *1 (E.D. Pa. July 27, 2020).

[56] *Id.* (citations omitted).

[57] *Id.*

[58] *United States v. Williams*, No. 15-471-3, 2020 WL 4756743, at *5-*6 (E.D. Pa. Aug. 17, 2020).

[59] *Id.* at *5 n.12.

[60] *United States v. Grasha*, No. 18-325, 2020 WL 5747829, at *5 (W.D. Pa. Sept. 24, 2020).

[61] *Id.* at *4.

[62] *Id.*

[63] *United States v. Moldover*, No. 14-637, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020).

[64] *Id.* at *3.

[65] *Id.* at *9.

[66] *United States v. Daniels*, No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020).

[67] *Id.*

[68] *Id.; see also United States v. Towel*, No. 17-519-6, 2020 WL 2992528, at *1-4 (E.D. Pa. June 4, 2020) (denying compassionate release where petitioner suffered from mild, exercise-induced asthma which was controlled in prison and for which petitioner did not require an inhaler to manage daily symptoms).

[69] ECF Doc. No. 1323-7 at 4-5.

[70] *Id.* at 5.

[71] *See* ECF Doc. No. 1333 at 13 n.5.

[72] *United States v. Rodriguez*, Nos. 11-251-01 and 12-486, at 6 n.8.

[73] *United States v. Wiltshire*, No. 11-310, 2020 WL 7263184, at *6 (E.D. Pa. Dec. 9, 2020).

[74] U.S. Sent'g Guidelines, § 1B1.13, Application Note 1(C); *see, e.g., United States v. Williams*, No. 11-223-1, 2020 WL 4756738, at *5 (E.D. Pa. Aug. 17, 2020); *United States v. Dunich-Kolb*, No. 14-150, 2020 WL 6537386, at *8-*9 (D.N.J. Nov. 5, 2020); *United States v. Henry*, No. 13-91, 2020 WL 3791849, at *1, *4 (E.D.N.Y. July 6, 2020).

[75] *United States v. Cruz-Rivera*, No. 11-43, 2020 WL 5993352, at *7 (E.D. Pa. Oct. 9, 2020).

[76] *Id.*

[77] *United States v. Quintana*, No. 17-20043-02, 2021 WL 147987, at *3 (D. Kan. Jan. 15, 2021).

[78] *Id.* at *3.

[79] *United States v. Moore*, No. 14-209-2, 2020 WL 7024245, at *6 (E.D. Pa. Nov. 30, 2020).

[80] *Id.*

[81] *United States v. Bucci*, 409 F. Supp. 3d 1, 1-3 (D. Mass. Sept. 16, 2019).

[82] *Id.* at 2.

[83] *United States v. Seals*, No. 11-36-11, 2020 WL 7624948, at *1-*3 (E.D. Pa. Dec. 22, 2020).

[84] *Id.* at *3.

[85] *U.S. v. Clausen*, No. 00-291-2, 2020 WL 4260795, at *8 (E.D. Pa. July 24, 2020) (citing *Rodriguez*, 2020 WL 1627331, at *11 (quoting U.S. Sent'g Guidelines § 1B1.13(2))).

[86] *Id.*

[87] *Id.* (citing 18 U.S.C. § 3142(g)(1)–(4)).

[88] *Drug Overdose Deaths in the United States, 1999–2015*, Ctrs. for Disease Control & Prevention (Feb. 24, 2017), https://www.cdc.gov/nchs/products/databriefs/db273.htm#fig5.

[89] *United States v. Lugo*, 832 F. App'x 799, 800-01 (3d Cir. 2021).

[90] *Id.*

[91] *United States v. Parks*, No. 17-296-01, 2021 WL 354413, at *7 (E.D. Pa. Feb. 2, 2021).

[92] *Id.*

[93] *Id.* (citations and quotations omitted).

[94] *Id.*

[95] *United States v. Santiago*, No. 16-505, 2020 WL 4015245, at *3 (E.D. Pa. July 15, 2020).

[96] *Id.*

[97] *Id.*

[98] *United States v. Concepcion*, No. 02-488, 2021 WL 50852, at *8 (E.D. Pa. Jan. 6, 2021).

[99] *Id.* at *7.

[100] *Id.* at *8.